J-A18031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RAYMONT WALKER | : | |
| | : | |
| Appellant | : | No. 1025 WDA 2018 |

Appeal from the Judgment of Sentence Entered February 9, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0006204-2007

BEFORE: BOWES, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                    **FILED FEBRUARY 18, 2020**

Raymont Walker appeals from the February 9, 2018 order dismissing his after-discovered evidence claim and resentencing him pursuant to ***Commonwealth v. Miller***, 567 U.S. 460 (2012), and ***Montgomery v. Louisiana***, 136 S.Ct. 718 (2016). We affirm.

The trial court summarized the relevant facts as follows:

. . . . Kendall Dorsey testified that on December 23, 2006, while sitting on the front porch with his friend Kevin Harrison, he saw [c]o-defendant Terrill Hicks shooting at him and at Harrison. Dorsey saw Appellant standing with Hicks. Dorsey scurried into the house and avoided injury, but Harrison was shot and killed shortly thereafter.

Dorsey testified that a few days earlier he was at his friend John McDonald's house. He heard a knock on the door. Another friend, Michael Harris, answered the door. Immediately, Terrill Hicks attempted to pull Harris out of the house. The attempt was unsuccessful as Harris was able to close the door. Dorsey testified that he went upstairs, looked out a window and observed Appellant and Hicks in the street holding pistols.

Dorsey testified that he encountered Hicks the following day, the day before the shooting. Hicks said that he had been robbed, and that he thought that Dorsey, Harris and Harrison did it. Dorsey said he did not rob Hicks.

The next day, the day of the murder, Dorsey testified that Hicks and [Appellant] drove up to Dorsey and Harrison while they were walking a dog. Hicks and [Appellant] exited the car, and [Appellant] said, "Where is Mike [Harris] at?" Dorsey observed that both Hicks and [Appellant] had weapons. Dorsey and Harrison lied, denying that they knew Harris'[s] location, and eventually Hicks and [Appellant] got back in their car, a white Impala, and left.

Dorsey testified that he and Harrison immediately returned to Harrison's house, where Harris was. Dorsey noticed the white Impala circling the house, the same car in which he had just seen Hicks and [Appellant]. He safely entered the residence but eventually went outside to the front porch with Harrison to smoke a cigarette. Dorsey told Harris not to join them on the porch because Hicks and [Appellant] were looking for him. Hicks and Appellant approached the house. Hicks fired approximately ten shots, killing Kevin Harrison.

John McDonald testified similarly to the incident at his house. McDonald said that he encountered Hicks at a gas station the day before Hicks came to his house. McDonald said Hicks was upset because he had been robbed. Hicks did not know who had robbed him.

McDonald said that, on the following day, Hicks attempted to forcibly remove Harris from McDonald's home when Harris answered the door. The day after, Hicks and [Appellant] came to his house again. By that point, Hicks had become convinced that Harris, Harrison and a third individual nicknamed "Dee" had robbed him. Hicks told McDonald that he was looking for the people that he thought had robbed him, and if Hicks found them, either they would get hurt or someone would die. [Appellant] added that what the robbers had done "wasn't cool" and that he "was going to ride with [Hicks,]" his best friend. McDonald, an army sergeant with eight years of military experience, recognized the gun Hicks was carrying as a "Glock 45."

Michael Harris testified that he was inside the house on the couch in the front living room when the shots were fired. He heard the shots hit the house, so he moved to the floor and exited toward the rear of the house. He also reiterated that Hicks had attempted to pull him out of the residence of McDonald the day before the shooting.

John Betarie, a Homestead police officer, testified that he recovered six shell casings at the scene of the shooting where Dorsey said Hicks was standing and three additional projectiles from the kitchen floor. These shell casings were sent to the crime lab [for] analysis. Dr. Robert Levine, a forensics expert to the crime lab, testified that the [.]45 caliber casings found at the scene were all from the same weapon.

Dr. Abdulrezak Shakir, a forensic pathologist with the Allegheny County Medical Examiner's Officer, conducted the autopsy of Kevin Harrison. Dr. Shakir stated that Harrison was shot three times. He concluded that Harrison died as a result of a gunshot wound to the head, and ruled the manner of death as homicide.

Trial Court Opinion, 1/3/11, at 3-5.

Appellant was fifteen years old at the time of the shooting. He was arrested, charged, and tried jointly with Hicks as an adult for the murder of Harrison. At the 2010 trial, neither of them testified on his own behalf. At the conclusion of trial, the jury convicted Appellant of first-degree homicide, criminal conspiracy, criminal attempt – homicide, aggravated assault, and possession of a firearm by a minor. On August 2, 2010, Appellant was sentenced to life without the possibility of parole ("LWOP") for first-degree murder, a consecutive prison term of ten to twenty years for criminal attempt, and a consecutive thirty to sixty months for aggravated assault. The court imposed no further penalty for the remaining convictions. Appellant filed a

direct appeal and we affirmed his judgment of sentence on April 30, 2012. *See Commonwealth v. Walker*, 48 A.3d 490 (Pa.Super. 2012) (unpublished memorandum).

On July 30, 2012, Appellant filed his first PCRA petition. In the timely petition, he raised a multitude of issues, including an argument that he was entitled to resentencing pursuant to *Miller*. The PCRA court held a hearing on May 31, 2013, and denied the petition on November 25, 2013. On appeal, we affirmed that denial. *See Commonwealth v. Walker*, 125 A.3d 460 (Pa.Super. 2015) (unpublished memorandum). Appellant filed a petition for allowance of appeal in our Supreme Court, which was held in abeyance pending the United States Supreme Court's decision in *Montgomery*.

While Appellant's PCRA petition was pending in the Supreme Court, Hicks, who was also a juvenile when the murder occurred, was resentenced pursuant to *Miller*. At his resentencing hearing, on October 23, 2015, Hicks admitted to firing the shots that killed the victim and said that Appellant was not with him that night. On December 15, 2015, Appellant filed a second PCRA petition, seeking a new trial on the basis of after-discovered evidence due to Hicks's confession at his resentencing hearing.

Following the United States Supreme Court's ruling in *Montgomery*, our Supreme Court vacated this Court's order affirming Appellant's judgment of sentence, and remanded the case for further proceedings consistent with *Montgomery*. *See Commonwealth v. Walker*, 132 A.3d 980 (Pa. 2016).

We vacated Appellant's judgment of sentence and remanded to the trial court for resentencing. *See Commonwealth v. Walker*, 145 A.3d 782 (Pa.Super. 2016) (unpublished memorandum).

Upon motion by the Commonwealth, Appellant's two PCRA petitions were consolidated into one evidentiary hearing, which was held on February 9, 2018. At the hearing, Hicks reiterated the testimony from his own resentencing hearing, that he was the shooter and Appellant was not involved in the murder. The court found Hicks's testimony to be incredible and denied Appellant's after-discovered evidence claim. The trial court also conducted a resentencing hearing, imposing a new aggregate sentence of thirty years to life in prison.

Appellant filed a timely post-sentence motion challenging the discretionary aspects of his sentence and the denial of his request for a new trial on the grounds of after-discovered evidence. The trial court denied the post-sentence motion and a timely notice of appeal followed. Both Appellant and the trial court complied with the mandates of Pa.R.A.P. 1925.

Appellant raises the following issues for our review:

I. Did the trial court err when it denied [Appellant's PCRA petition] for a new trial on the ground of newly-discovered evidence where (1) the testimony provided by Terrill Hicks could not have been obtained prior to the conclusion of trial through the exercise of reasonable diligence as Hicks was [Appellant's] co-defendant and Hicks invoked his Fifth Amendment right to remain silent at trial; (2) [Hicks'] testimony was not merely corroborative or cumulative of other evidence presented at the trial and would not have been used solely to impeach the credibility of a witness; and

- 5 -

(3) [Hicks'] testimony would result in a different verdict if a new trial were granted in [Appellant's] case?

II.    Did the trial court abuse its discretion when it resentenced [Appellant] to serve an aggregate sentence of [thirty] years to life where such a sentence is manifestly unjust, unreasonable and excessive when considered in light of [Appellant's] personal history and characteristics and the many mitigating factors presented on [Appellant's] behalf?

Appellant's brief at 6.

First, Appellant attacks the trial court's denial of his after-discovered evidence claim[1] regarding a newly-discovered witness.  Our standard of review examines "whether the PCRA court's determination is supported by the evidence of record and free of legal error.  We grant great deference to the PCRA court's findings, and we will not disturb those findings unless they are unsupported by the certified record."  **Commonwealth v. Holt**, 175 A.3d 1014, 1017 (Pa.Super. 2017) (citation omitted).  Additionally, we "may affirm a PCRA court's decision on any grounds if the record supports it."  **Commonwealth v. Rykard**, 55 A.3d 1177, 1183 (Pa.Super. 2012).

In order to succeed on a claim of after-discovered evidence, Appellant must show, by a preponderance of evidence, that the witness's testimony:

_____

[1] Although facially untimely, the trial court accepted this claim as a supplement to Appellant's first, timely filed and still pending PCRA petition.  Thus, this additional claim was timely.  Had the court not done that, Appellant would have met the newly discovered facts exception to the PCRA's time bar, since he established that he raised this claim within sixty days of discovery and could not have obtained the evidence sooner with the exercise of reasonable diligence.  **See** 42 Pa.C.S. § 9543(a)(2)(vi).

> (1) has been discovered after the trial and could not have obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely for impeaching credibility of a witness; and (4) is of such nature and character that a different verdict will likely result if a new trial is granted.

*Commonwealth v. Pagan*, 950 A.2d 270, 292 (Pa. 2008). When deciding the fourth prong, the court considers "the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." *Commonwealth v. Padillas*, 997 A.2d 356, 365 (Pa.Super. 2010). Importantly, accomplice testimony is viewed with suspicion where the accomplice has already been convicted so that he "has nothing to lose." *Commonwealth v. Washington*, 927 A.2d 586, 597 (Pa. 2007).

The court held an evidentiary hearing on this issue. At the hearing, Hicks testified that he committed the homicide with Derrick Price, not Appellant. N.T. Resentencing Hearing, 2/9/18, at 54. He explained that he was closer with Appellant's brother, and did not know Appellant well, but that they were "cool." *Id*. at 55. However, when tested on cross-examination, he did admit to spending the majority of the day of the murder with Appellant. *Id*. at 64. He maintained that there was "no elaborate plan" to murder anyone, and his intent when he fired ten shots at these people was to "scare them." *Id*. at 56, 66. The fact that the victim died as a result was "an accident." *Id*. at 66.

Notably, although Hicks was housed in the same facility as Appellant since 2010, he testified that he waited six years to tell Appellant that he knew Appellant was innocent, until after his own resentencing hearing concluded. *Id*. at 50-51. On January 15, 2016, Hicks gave Appellant an affidavit indicating Appellant's innocence. However, when Hicks received a second resentencing hearing, he retracted the affidavit. *Id*. at 54-55, 62. Once Hicks was resentenced for the second time, he again came forward, agreeing to testify for Appellant because he was "more mature" now. *Id*. at 63. Finally, Hicks admitted that he lied during both of his pre-trial interviews with police. *Id*. at 69.

At the conclusion of Hicks's testimony, the court explained all of the inconsistencies in Hicks's testimony that, when viewed in light of the Commonwealth's evidence presented at trial, led it to conclude that Hicks's testimony would not change the outcome if Appellant were granted a new trial:

> . . . . unfortunately[,] Mr. Hicks'[s] testimony has over the course of time lacked credibility, and up until today he seems to demonstrate inconsistencies that make it not credible. To say that it was an accident, to stand directly across the street and shoot ten shots at two people on the front porch to scare them, to say that he's never told anyone before today who the person with him was, first, is to admit that there was a person with him, but second, is inaccurate as to what is shown by later testimony, that Price was named by Mr. Hicks at his second interview with the police, and not just for the retaliatory shooting.
>
> Mr. Hicks initially testified here today that he was not with [Appellant] that day at all. When challenged about the testimony about the Impala from the trial, suddenly he remembered that he

had spent a good bit of time with [Appellant] that day, had been to the mall. They had played – he had left and returned and played games with [Appellant].

And the testimony from the trial, as I recall it, is that less than an hour before the shooting Mr. Harrison and Mr. Dorsey saw Mr. Hicks and [Appellant] together [in] that Impala and then watched that Impala circling the house, the front porch of which was then shot at.

With regard to Mr. [Hicks's] testimony that it again was an accident, there was no planning. That would be contrary to the testimony of a man with the last name McDonald who had no apparent interest in any of this. He appeared to be an independent party. His testimony, as I recall, was to an incident a couple days before the shooting where [Appellant] and Mr. Hicks were at Mr. McDonald's home and said they were looking for Dorsey, and Harrison -- Harris and Harrison, and if that -- if they found them, it was [Appellant] – Mr. Hicks who said someone would get hurt or get killed, I believe.

And according to Mr. McDonald's testimony, Mr. Hicks then made a – I'm sorry, [Appellant] then made a statement to the effect that he was going to stand by his friend, go along for the ride, something to that effect.

So there was corroborating evidence to the identification, and it is clear that unlike a case where there might be mistaken identification, these people all knew each other. So I cannot find, in light of all of this, Mr. [Hicks's] testimony today to be credible.

N.T. Resentencing Hearing, 2/9/18, at 88-90.

Thus, the court found Hicks' testimony to be lacking in credibility, such that it would not change the outcome if a new trial were to be held. We discern no abuse of discretion. Hicks delivered inconsistent testimony. Perhaps most glaringly, he failed to offer an adequate explanation for why he recanted his initial affidavit before his own second resentencing hearing was completed.

In his reply brief, Appellant attacks the court's failure to commence its examination of the persuasiveness of Hicks's testimony from the assumption that the jury would believe it. Appellant's Reply Brief at 4. In support of his position, Appellant directs our attention to **Commonwealth v. Payne**, 210 A.3d 299 (Pa.Super. 2019) (*en banc*), a case where we stated that the court "must examine the persuasiveness of the new evidence assuming the fact-finder believes it." **Id**. at 302. However, Appellant's reading of **Payne** oversimplifies the necessary analysis that a court must undertake in these circumstances. This Court went on to explain that this type of analysis prompts the court to consider the nature of the new evidence in light of other trial testimony, evaluating whether the new evidence is consistent or inconsistent with the previous trial testimony. **Id**. This context is critical to our analysis.

Appellant is correct that the trial court did not explicitly use the magic words, "assuming the fact-finder believes it." Appellant's Reply Brief at 4. However, the absence of these words does not mean that the trial court engaged in an improper evaluation of the evidence correctly. As the trial court's analysis demonstrates, it compared Hicks's testimony with the other evidence presented by the Commonwealth at trial. Ultimately, the trial court concluded that Hicks's testimony was too inconsistent with the credible eyewitness testimony, placing Appellant with Hicks in the days and minutes leading up to the murder and repeatedly threatening the victims and

brandishing firearms, to change the outcome. Eyewitness identification testimony of Appellant at the scene of the crime also directly contradicted Hicks's testimony that Appellant was not present. Since the trial court conducted the correct analysis and the record supports its conclusions, we find no abuse of discretion in its decision to deny Appellant's after-discovered evidence claim. Accordingly, we affirm the trial court's denial of Appellant's after-discovered evidence claim.

In his next issue, Appellant challenges the discretionary aspects of his sentence. Specifically, he alleges that the resentencing court imposed a sentence without first considering his personal history, characteristics, and other **Miller**[2] factors. Appellant's brief at 83.

_____

[2] In **Miller**, the Supreme Court listed factors that resentencing courts must consider before issuing a life without parole sentence to a juvenile. Our Supreme Court summarized those factors in **Commonwealth v. Batts** "Batts II", 163 A.3d 410 (Pa. 2017), as follows:

> Immaturity, impetuosity, and failure to appreciate risks and consequences; . . . . the family and home environment that surrounds him – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional; . . . . the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him; . . . . that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys; . . . . and the possibility of rehabilitation . . . . when the circumstances _i.e._ (the youthfulness of the offender) most suggest it.

**Id**. at 431 (cleaned up).

- 11 -

We note preliminarily that since the Commonwealth did not seek a LWOP sentence, the resentencing court was not required to consider the *Miller* factors. *See Commonwealth v. White*, 193 A.3d 977, 983 (Pa. Super. 2018). However, because Appellant's issue also raises a claim that the court failed to consider relevant sentencing factors engrained in the sentencing code, we consider his arguments under the discretionary aspects of sentencing scheme. *See id*. (holding that the *Miller* factors were immaterial where the Commonwealth did not seek LWOP, and instead, considering the sentencing issue as a discretionary aspects challenge under the sentencing code).

The following principles apply to our consideration of whether review of the merits of this claim is warranted: "An appellant is not entitled to the review of challenges to the discretionary aspects of a sentence as of right. Rather, an appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction." *Commonwealth v. Samuel*, 102 A.3d 1001, 1006 (Pa.Super. 2014). In determining whether an appellant has invoked our jurisdiction, we consider four factors:

> (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

*Id*. at 1006-07.

Appellant timely filed both a post-sentence motion and a notice of appeal. In his motion, Appellant challenged the court's alleged failure to

consider all of the mitigating facts that were submitted, including Appellant's personal history and background. Therefore, this issue was properly preserved. Appellant's brief contains a statement of reasons relied on for allowance of appeal pursuant to Pa.R.A.P. 2119(f). In his statement, Appellant claims that a substantial question is presented by the fact that the trial court violated a fundamental norm in the sentencing process when it imposed an excessive sentence without considering Appellant's personal history and characteristics. Appellant's brief at 77. We find that this claim raises a substantial question since Appellant is challenging the excessiveness of his sentence in conjunction with the resentencing court's alleged failure to consider mitigating factors. *White*, *supra* at 984 (finding that a substantial question was raised where a juvenile, previously sentenced to LWOP, raised an excessive sentencing claim along with an assertion that the sentencing court failed to consider mitigating factors). Accordingly, we now turn our attention to Appellant's challenge to his sentence.

The following principles apply to our substantive review of Appellant's claim: "When reviewing sentencing matters, this Court must accord the sentencing court great weight as it is in the best position to view the defendant's character, displays of remorse, defiance or indifference, and the overall effect and nature of the crime." *Commonwealth v. Ventura*, 975 A.2d 1128, 1134 (Pa.Super. 2009). "We cannot re-weigh the sentencing factors and impose our judgment in the place of the sentencing court."

*Commonwealth v. Macias*, 968 A.2d 773, 778 (Pa.Super. 2009). Instead, we review the trial court's determination for an abuse of discretion.

> In this context, an abuse of discretion is not shown merely by an error in judgment. Rather[,] the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Antidormi*, 84 A.3d 736, 760 (Pa.Super. 2014).

A trial court's sentence "should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). "When imposing sentence, a court is required to consider the particular circumstances of the offense and the character of the defendant. In considering these factors, the court should refer to the defendant's prior criminal record, age, personal characteristics and potential for rehabilitation." *Antidormi*, *supra* at 761 (citations and quotation marks omitted).

Once LWOP is foreclosed as a resentencing option, the *Batts II* Court instructed juvenile resentencing courts to impose a minimum term of years sentence with a maximum sentence of life imprisonment, utilizing 18 Pa.C.S. § 1102.1 for guidance. Under § 1102.1, a juvenile convicted of first-degree murder who was fifteen years of age at the time of the crime shall be sentenced to a minimum term of imprisonment of at least thirty-five years, with a maximum sentence of life. 18 Pa.C.S. § 1102.1(a)(1).

Appellant received an aggregate sentence of thirty years to life and he alleges that the resentencing court provided an "inadequate statement" at the resentencing hearing of its reasons for imposing that sentence. Appellant's brief at 83. More specifically, Appellant claims that the court failed to fully consider Appellant's age, personal history, and the information contained within his mitigation report. *Id*. A review of the record belies Appellant's assertions.

The resentencing court began the hearing by acknowledging its review of Appellant's mitigation report and summarizing the main points on the record:

> I have read [Appellant's] sentencing memorandum. It does include a number of certificates of completion of various programs and a statement that other than two incidents in 2011 and 2012 and one in 2015 he has been misconduct free.
>
> He has been recommended as a mentor and works in the maintenance area with a high rating.

N.T. Resentencing Hearing, 2/9/18, at 7. The court entertained Appellant's witnesses who testified about his school experiences pre-incarceration and progress in prison. The court also heard argument by Appellant's attorney's, along with Appellant's allocution expressing remorse to the family of the victim before fashioning its sentence. *Id*. at 14-43, 94-102. Notably, Appellant's attorney pointed out that Appellant was mere months beyond his fifteenth birthday when he was an accomplice to this murder, which is significant

because § 1102.1 places the starting point for his minimum sentence ten years higher than if he had still been fourteen years old. *Id*. at 97.

The sentencing court received and considered extensive mitigation evidence at the resentencing hearing about Appellant's age and personal history. Thereafter, the court placed its reasons on the record for imposing the thirty-year minimum sentence:

> So with regard to the sentencing factors, I have taken into consideration the guidelines for a person over the age of [fifteen] being a minimum sentence of [thirty five] years, as compared to the guidelines for a person who is one under [fifteen] years of age. That is [twenty five] years. And, I note that [Appellant] was about two months over the age of [fifteen].
>
> And in regard to the list of factors to be considered, the extent of his participation does differ from Mr. Hicks in that Mr. Hicks was the shooter. However, it is also clear that [Appellant] was with Mr. Hicks in the days leading up to the shooting and in the hour leading up to the shooting at the white Impala, based on the testimony of Mr. McDonald, and it was – I believe it was Mr. Dorsey with regard to the Impala.
>
> He was, by virtue of the testimony of the teachers who were here today, in school, somebody they considered to be a kind person, who did appear to be more of a follower, a passive personality as opposed to an aggressive personality. And while he was ultimately removed from that school in the tenth grade because of behavior issues, the nature of those issues was not clear in any of the material I received here today.
>
> By virtue of the testimony of the teachers who were present, it appeared to be more likely non-combative type but more in the manner of maybe not following rules or being a jokester or something of that nature. There is no evidence that the behaviors that caused him to be expelled were of a violent nature.
>
> In addition to that, your testimony from the witnesses at SCI Pine Grove do indicate a young men who after an initial adjustment period has made efforts to rehabilitate and has

completed a number of programs and is a mentor, a good mentor for other young men at SCI Pine Grove. He does have extensive family support here with him today.

So in light of all of the factors that I need to consider in making a sentence, I would resentence him as follows. . . .

*Id*. at 106-07. The court then reiterated its explanation from the hearing in its opinion:

Appellant asked that he receive an aggregate minimum of 20 years. The Commonwealth asked the [c]ourt to set the minimum at 47.5 years, the same sentence as Hicks received after his *Miller* resentencing hearing. This [c]ourt, in imposing a [thirty] year minimum sentence, considered the *Batts* guidelines for a [fifteen] year old convicted of homicide. This [c]ourt further considered the extent of Appellant's participation in the crime, in that Appellant was not the shooter but actively participated in planning the ambush and locating the victim. This [c]ourt further considered the testimony of the teachers who testified at the sentencing who described Appellant as kind, a follower and having a passive personality. In addition, this [c]ourt considered the testimony regarding Appellant's positive adjustment to incarceration, the numerous programs he has completed, his status as a mentor, as well as his extensive family support. The sentence imposed balances this [c]ourt's appreciation of the severity of the charges with its consideration of Appellant's potential for rehabilitation.

Trial Court Court Opinion, 11/2/18, at 5.

Our review confirms that the resentencing court considered prior to imposing sentence every mitigation factor that Appellant claims in his brief that the court failed to. The court then weighed the mitigation evidence against the nature of the crime and victim impact statement in light of § 1102.1. We have no license to reweigh the evidence. *See Macias*, *supra* at

778. Consequently, Appellant is not entitled to any relief on his second claim and we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/18/2020